Hear ye, hear ye, hear ye. The United States Court of Appeals for the Fifth Circuit is now open according to law. God save the United States and his Honorable Court. Good morning. I want to thank all of y'all for being available on rather short notice this morning. Well, let's hear from the State of Texas first, Mr. Nielsen. Thank you, Chief Judge Richmond. And may it please the Court, Aaron Nielsen on behalf of Texas. SB 4 is a modest but important statute. It's modest because it mirrors federal law. It's important because it helps address what even the President has called a border crisis. Nonetheless, just a few days before SB 4 was to go into effect, the District Court entered a facial reinforcement injunction. This is extraordinary. It's only appropriate if SB 4 can never be lawfully applied no matter the facts. That's not remotely the case. Texas offers four arguments why it is likely to prevail on appeal, any one of which will require this court to vacate the District Court's decision. First, this case does not belong in federal court at all. I know the other side doesn't spend a lot of time on this issue, but there really is no standing by the organizational plaintiffs and nobody has a cause of action. This case should not be in federal court. Second, nothing about SB 4 is preempted. SB 4 does not address any exclusively federal field and it mirrors rather it conflicts with federal law. The District Court misread Arizona to conclude that everything is field preempted, but that's not what And under any plausible reading of that right, at least some applications of SB 4 are constitutional. That itself defeats a facial injunction. The District Court acknowledged that sometimes those associated with the cartels cross over the border with malicious intent. That's sufficient to say that some applications of the statute are constitutional, not preempted. And finally, if you disagree with me about everything else, at least some applications of this law are constitutional, and the District Court's severability analysis is woefully deficient. He essentially said, I think everything's field preempted, but if I'm wrong about that, there might be some applications. It's not practicable. That's the quote, practicable, to get into all of that here. And that's not how you can do a severability analysis at a law that's as important as this, which the other side doesn't spend a lot of time on, which is about as robust of severability clause as this court is likely to ever find. So given the District Court's legal errors, it per se abuses discretion. And even if the court considers the equities, they plainly support Texas here. I would point the court to Chief Judge Moses's decision where she went through findings of fact about what's happening at the border right now. I would also point the court to the State of the Union address. That's a new one. I've never done that before, but I'd point the court to it. I would also point the court to the FBI director's testimony where everybody's concerned about the border. There's a real crisis going on here. Texas has decided that we are at the epicenter of this crisis. We are on the front line, and we are going to do something about it. And we have tried to do the very best we can to fall within the scope of the Supreme Court's decision in Arizona. So in Arizona, there were provisions that did not match with what federal law says. Here we've tried to mirror federal law. And it's hard to see how a state law that mirrors federal law about a core state police power can nonetheless be preempted in all applications facially. And we know that this isn't field preemption because as we point out, I'm sorry, Your Honor. You say core police power. This is the first time, it seems to me, that a state has claimed that they have the right to remove illegal aliens. I mean, this is not something that a power that historically has been exercised by states, has it? Well, it depends on what we mean by removal. I think this is important. I think that it's certainly true that a state doesn't generally have the power to, you know, admit or exclude. But what SB 4 does here is you get the order from the judge and the person is taken to the port of entry. So as both a legal matter and as a practical matter, and I could point the court to the declaration, that means that the United States has custody of the person. So if the United States has custody of the person, they can decide what to do with the person at that point. It's not like the Wild West where we're just saying, like, go get out of here. They take you, they escort the person to the port of entry where the United States has them. OK, I guess I have some basic questions about how this works. You take him to Brownsville and the Border Patrol says we're going to re-release them back into Texas. Then what happens? So that's a good question. Part of the problem here is this is pre-enforcement. So I'm not entirely sure how the Texas courts would interpret the provision. So I'm going to do my best here, you know, on behalf of the state to say how we understand it. But, you know, I have declarations which are in the record that says we're going to try to cooperate with the federal government. If the federal government says the person has some sort of lawful status. Now, I'm not saying like they're admitted as a citizen or something. If they have some sort of lawful status, well, then that's going to be continued. You know, we're not going to we're not going to get into this. We're going to we're not going to take them into custody. We're not going to make them cross the Mexican border. See ya. Well, sure. Then I think what would happen in that situation is they would be arrested for a violation of the Texas statute. Again, they would be re-arrested? Well, I believe so. Again, this is uncharted because we don't have any any cases on it. But if they are, you know, in the United States in contravention of Texas's law, my understanding is that they would be arrested. Again, I don't have any from the declarations on this. This point didn't come up before in the district court, which it's unfortunate. This is all done on the papers. So we have declarations and they have declarations. I think this would be helpful and nothing else to have some fact finding about how some of that might actually play out. So I'm not trying to avoid your honor's question, really, truly not. I was just trying to envision how this all plays out. A couple of things, just because I'm not sure I understand the law totally. Section 51.02, it says if an alien enters directly from a foreign nation at any location other than a lawful port of entry. So what if someone enters in, let's say from Mexico into Arizona and lives there for five years, then moves to Texas? Are they covered? I don't know the answer. I could. I mean, I think that, you know, I'm reading the text, you know, maybe I know the Texas. You would know better than me. Texas recognizes absurdity and all sorts of limiting constructions. I don't think that is at the core of what the Texas legislature intended. I am assuming if they were in Arizona for that long, they have some sort of legal status. Is your honor's suggesting that they have no legal status at all and they just know it just struck me. If you just look at it on its face, it says if they enter this state directly from a foreign nation. At any location other than a lawful port, it just seems to me if you came in, let's say, through Canada and travel through five, six, seven days before you get here. Did you travel directly to this state from a foreign nation? I just didn't know what that meant. I confess, Your Honor, I don't know. I'm assuming under the fact pattern that the person never went to a port of entry, so they have no status under the United States. I think that would be a question that they would argue in court. And they would say that it's not within the scope of the statute. And, you know, assuming that this position, I don't want to eat up all your time on that. But if they do come through a port of entry and they're given a notice to appear at a hearing, are they exempt from this statute? I don't know if exempt is the right word, but we have declarations that say that we are going to facilitate all of your federal rights and procedures. Again, I'm happy to point the court to those. Well, 51.02C2 says the defendant's conduct does not constitute a violation of 8 U.S.C. Section 1325A, which is improper entry. So, in other words, if I show up at Brownsville, I get at least a notice of appearing on an asylum claim or a CAT claim? Yes. Is that exempt under 51.02? So I don't know if, as I read the text of the statute, I am not sure. I do know that we have declarations about how it's going to be enforced, how we understand the law. And we say that – I'm pointing – this is the Victor Escalon declaration, where he says that, you know, when aliens communicate a request for asylum or other immigration relief in the United States, we respond by informing them of their opportunity. And then we go on further, and it says we intend to coordinate with personnel from the Office of Field Operations with U.S. Customs and Border Patrol. And then we say – next point here – should DPS become aware that a detained alien has a pending application for asylum or other relief with the federal government, DPS intends to coordinate with federal immigration officials before executing the order. Again, throughout this, we've been kind of characterized as Texas is, you know, trying to, like, take over the field. And that's really not true. What Texas wants to do is be able to coordinate with the federal government. Congress is the one that creates the immigration laws, and our laws mirror what Congress has decided. And we know from the Supreme Court's decision in Kansas v. Garcia that enforcement priorities of the executive branch aren't themselves law with preemptive effect. So we're looking at the laws that Congress passed, and we're trying to coordinate. And we also know – again, Your Honor knows better than me – Texas tries to be consistent with federal law. We don't go out of our way to create conflict when there's a harmonious reading available. So what I – what Texas is trying to do here in our – you know, I have our declarations about how we intend to enforce the statute. What we're trying to do is to make sure that Congress, who sets the national immigration laws, that those laws are followed. And to the extent that we can't enforce federal law, which we're not claiming to do, we have laws that are the same as that with respect to these important provisions. And we're going to enforce our own laws as a sovereign. And I don't see how that could be conflict preempted. It's certainly not facially conflict preempted, which would require every single application to be preempted. And I don't see how that makes sense. And I don't think the district court's decision, if the court goes and reads it, will be able to find that type of analysis, which I think is important. But I mentioned earlier that, you know, it's easy to get into the kind of the merits of this, but there are threshold problems here. I don't quite understand how, under this court's precedent, the organizational plaintiffs think that they have standing. Let's focus on the United States. Sure. Oh, I thought you had a further question. Yes, so the United States, we're not contesting the United States has standing. We don't see how the United States has a cause of action. And the cause of action they rely on is in raid devs. And, you know, maybe they could have relied on in raid devs before the Supreme Court decided Armstrong and before the Supreme Court has gone on a series of cases in recent years saying, you know, courts don't just create causes of action. But that's not where we are. And even if you go back to devs, I've found most helpful is the article written by Professor Bray and bombs. I about what devs means. They call it a litigation superpower. And the idea is, if you're going to have a litigation superpower like this, which allows the United States to come in and say things are unlawful and needs to be tied to equity. And, you know, devs was a proprietary interest. And I think something like that is required here. United States just can't come in and say without any permission from Congress, we're just going to come and just kind of rove around and decide if we think some state laws are preempted or not. Now, maybe Congress could give them that authority. The Congress never has done so. And they're kind of their fallback argument on that is, well, what about ex parte young? And I think that kind of illustrates the hard spot that they find themselves in. I don't think in the history, at least I have not found it. I apologize if I've missed it. I don't think the United States has relied on ex parte young. Ex parte young allows private individuals or sometimes entities of a state to bring a claim to get around 11th Amendment immunity. But here we're talking about the United States saying we're going to bring a claim as if we are a regular person. And by the way, if they were a regular person, they're not being subject to this law anyway. So they couldn't bring such a claim. So I don't think organizational plaintiffs have standing. And I don't see how the United States has a cause of action. And, you know, again, maybe the court's not going to agree with me on that. But in this preliminary posture, I think the court should say, well, Texas has at least shown a pretty good argument, maybe a likelihood of success on the merits. And then you get to the equities. And here I think the equities are very strong. Again, it's the FBI director saying there's a crisis at the border. It's a national security adviser saying there's a crisis at the border. It's the president United States saying there's a crisis at the border. And, you know, again, I think Chief Judge's Moses decision where he she lays out the facts, I think, is really helpful for us there. And just kind of one more point. I know that we're short on time here, if I may, Your Honor. But I think, you know, one of their arguments is that Arizona says essentially all of this is field preempted. And that's, you know, I've read Arizona at this point a fair number of times. I just don't see how you find that in the decision. The very first part of the decision says field preemption. That's about alien registration, which we're not talking about. The rest is conflict preemption. Like, it's obstacle preemption, which is not field preemption. So if they want to make an argument about conflict preemption, they need to get granular and discuss, like, this is what they said in the Arizona decision. This is what Texas law does. But they don't do that. And I think they don't do that because unlike the provisions at issue in Arizona, the provisions here mirror federal law. And if you mirror federal law, you don't have that type of conflict. Now, maybe you could say it's a conflict with enforcement priorities. But the Supreme Court has since come in in Kansas v. Garcia. Let me just what do you do with this? There are other phrases, but passages. Arizona says a decision on removability requires a determination whether it is appropriate to allow a foreign national to continue living in the United States. Decisions of this nature touch on foreign relations and must be made with one voice. Removal decisions, it goes on and on and on. It talks about the discretion. Even if they're here unlawfully, the United States can decide not to remove them. It seems to me this statute washes that away. I hear that, Your Honor. And I guess I would say two things. First, you know, let's assume that that is correct. I'm going to say why I don't think that is. Let's assume that's correct. It still doesn't mean that Texas loses. That's the type of severability analysis that the district court should have done. You could perhaps sever the removal provisions but still have the arrest provisions. So I don't think that that gets us out of the problem. But as to the actual merits, again, that is in the space of conflict preemption. And there they're talking about, I believe that's Section 6 of the Arizona law. And the problem there was there's no federal law that says you can't be in the United States if you're subject to removal. That's not against the law. That's not what Texas did here. It is against the law to cross the border outside of a lawful port of entry. And the declarations say essentially that, you know, Texas is almost always going to enforce this law when people are crossing the border and our agents see them crossing the border outside of the lawful port of entry. Well, that's not what they were talking about in Arizona. But regardless, my frontline argument is even if that's wrong in this posture, the answer would be severability. And the district court just didn't do it. So we're kind of in a hard spot where the district court just kind of throws everything in and says here's 140 pages. Policies pertain to the entry of aliens and their right to remain here are entrusted exclusively to Congress. The authority to control immigration, to admit or exclude aliens is vested solely in the federal government. Yes, Your Honor. And I think that that's important. The line about Congress is where I would be focusing on. Texas is doing what Congress has said. Congress has said this is against the law. And Texas says, OK, we're going to mirror that. But there's one more point. And I confess it's not as much in our state papers as it is in our merits brief, which we will be soon discussing in a couple of weeks. But I would point the court to Parker v. Brown from the Supreme Court from 1943. This is a case which is a field preemption case. And the court essentially said because the executive branch hadn't occupied the field that Congress had created, the court wasn't going to read it as field preemption. The idea I think I'm putting on my kind of my professor hat here is if you're talking about an implied anything, you're trying to ascertain what Congress would have wanted. And Congress assumes that the executive branch is going to do the law. And if they don't do that, if that assumption doesn't hold true, then you have to say, well, what would Congress want in this situation? And it seems to me that Congress has said we want the immigration laws enforced. And if the United States isn't going to do it, either because they don't have the resources or because they don't have the will, well, they've no longer occupied the field. And, you know, I think at that point it would be appropriate under Parker v. Brown for Texas to come in, at least in some applications, which, again, is all we need for a facial challenge. So that would be my answer there. I realize that I have gone over. I'm happy to keep answering the court's questions. I mean, I guess we can also talk a little bit about the equities, if that's appropriate. Do either of my colleagues have questions at this point? You've reserved some time for rebuttal. Thank you. Thank you, Your Honor. May it please the court, Daniel Tenney for the United States. In Arizona, the Supreme Court considered a state enactment that purported to create a state crime that paralleled, or at least purported to parallel, a federal criminal provision in the immigration area. And in that case, it was noncitizen registration. And so here Texas is saying that even if you can't, a state can't have a parallel crime for noncitizen registration, for the even more core aspects of federal immigration law, the entry of noncitizens into the United States and the removal of noncitizens from the United States, a state is nonetheless authorized to have a unilateral system without any coordination with the federal government on the face of the statute. Without regard to whether the federal government deems it appropriate to penalize these noncitizens in this way, without regard to the procedures that would accompany federal removal, which could be either a substitute for or complementary to criminal prosecution in the case of noncitizens. And there's really just no explanation for why you would have field preemption in the context of the more ancillary matter of noncitizen registration, but no field preemption for the core matters of entry and removal. And that, at least at this stage of the proceedings, resolves this case. All the district court did was preserve the federal system that's been in effect for 150 years based on repeated invocations of the Supreme Court. Well, his argument is that the executive branch is not enforcing the law and has not for years, decades, at least a decade. And therefore, they are no longer occupying the field. What's your response to that? There's a legal response and a factual response, Your Honor. The legal response, of course, is that the relevant question is what Congress has done, and Congress has robustly occupied this field. But the factual response is it's just wrong that the federal government isn't acting in this area. The district court cited numerous statistics about the federal government's active engagement in this area. And I mean, I can go through some of those, but I think another aspect of this that's crucial here is that the way the federal government goes about this is because it is fundamentally an international exercise, is through collaboration with other nations. And, you know, there there's a declaration in the record from Mr. Jacobson of the State Department discussing how, you know, figuring out what to do about the problems of irregular migration is a problem that has been addressed with the government of Mexico. Mr. Timmons, I understand that argument as to the removal. The thing I'm hung up on is that for you to win, you have to get relief against every provision of SB4, right, including the unlawful ports of entry and arrest provisions, right? I mean, for us to win in full, we would need to obviously, you know, if the court agrees with us on removal, we should at least get that much. But we submit, of course, that all the provisions are invalid. Well, in order to do that, obviously, we would have to reform the district court's injunction, which we don't normally do. We would vacate it and send it back and say it's at least overbroad. And so you have to figure this out. I mean, we're in the state posture, Your Honor. So if you thought I mean, again, we submit that the entire statute is invalid. But if you thought that the removal provisions were were unconstitutional, then it would be extraordinary to issue a stay of the district court's order that would allow those provisions to take effect. We're in the state posture. We're trying to predict the likelihood of what's going to happen when we hear the preliminary injunction proceeding. Right. And on the on the actual P.I. appeal. Right. The question will be, was it an abuse of discretion or otherwise unlawful for the district court to enjoin free enforcement before we know any of the questions that the chief judge was asking to your friend on the other side at the top side of this argument? We have no clue how any of this would actually be enforced because there's not been a single person who's been arrested, not a single person who's been ordered removed, not a single state judge who's had occasion to adjudicate a single provision of this in any way. So we're predicting all of this. Right. And we have to say all of it is unlawful. And therefore, the entire thing will never go into effect. So say if the federal court. I mean, that's that's not what happened in Arizona. The Supreme Court thought some aspects of the district court's injunction were proper and others were not. And it, you know, agreed and it left in place the ones that it thought were correct. And so can we talk about the provisions that are the harder ones for you, which is I don't understand the field preemption argument as applied to the ports of entry. So the way I read Arizona, there's only one field preemption piece. It's only section three. It's only about alien registration. And the court goes out of its way to say, look, the alien registration for as long you point these you point out these cases in your in some of your papers. Right. Going back to the exclusion cases in the late 19th century. What the terms of admission. Exclusively federal. Right. The terms of alien registration. Exclusively federal. Right. And so Heinz is obviously the big case. You cite this a great length. Right. From 1941 and World War One. World War Two. Excuse me. Where the court says, look, when it comes to who's allowed to be in the United States and the terms under which they're allowed to be here, that's exclusively federal. And so I understand field preemption there. But that's not what we're talking about in this case. As far as I can tell, there's not a single thing of us before. There's anything to do with alien registration, terms of employment, abilities to stay in the United States. Let's put removal for aside for a second. I'm just thinking about the courts of entry provision. I just don't understand how that triggers field preemption. It's you're factually correct that the Supreme Court case was about registration because Arizona had not gone as far as Texas has gone here. But the entry into the United States is obviously one of the areas that the Supreme Court has regularly described. And this provision is about. Criminalizing under state law, a manner of entry into the United States. And so to the extent that there is a distinction between what was happening in Arizona and what's happening here, it's that this is more at the heart of the area that the court has consistently recognized is is reserved for the national government. What would be the best case where the court has consistently recognized that policing ports of entry is exclusively or that is that policing the entry through ports of entry or otherwise is exclusively a federal thing? Because I understand when it comes to registration and who's allowed to be in the United States, that goes back over 100 years. I get that. But I'm trying to understand what is the what you say consistently. The courts consistently recognized it. What would be the best case where the court said, hey, states, when it comes to arresting people who entered the United States unlawfully, that is not a port of entry, not not through inspection. That's exclusive of the Fed's job. I mean, if you look at the district court's opinion at pages 30 to 31, it lists out a number of cases. And what they're talking about is, I mean, and the registration provision is in this same area is the conditions of admission to the United States. And Texas hasn't explained why where you enter the United States isn't equally a condition of coming to the United States as whether you register or whether you carry your registration with you on your person, which was another of the permissions in Arizona. So there really is no basis for saying that. OK, well, that was just about registration and there's something I mean, there's nothing uniquely federal about registration that isn't uniquely federal about determinations. If you think that a noncitizen is is improper, has improperly entered the United States, that those are determinations for the federal government. And it all ties, of course, to the removal, not just in the removal provision itself, but the determination. If you have a noncitizen who is unlawfully in the United States, a lot of times what the federal government will want to do is pursue removal proceedings rather than criminal proceedings and often expedited removal proceedings. And Texas is saying, no, we're going to have our process. We're not going to obey our process for that. And we're going to put this person in a state jail and without regard to the procedures that would be followed under the under the federal scheme. And it can practically interfere with it. And also the contemplation is also and this is another important point that the Supreme Court made in Arizona is that state judges will be making determinations about the legality of someone's entry into the United States. And that was something that this court in Farmer's Branch and the Supreme Court in Arizona said states simply are not supposed to be doing. And so this entire scheme is exactly what the Supreme Court warned against in Arizona. The Supreme Court said the federal government has to have control over the immigration system and then went on to say there are ways that states can participate and can help in the federal immigration system. And it gave some examples, like 1357, which is the provision that allows states to cooperate. But it said there's no coherent understanding of cooperation when the state is acting laterally. Can I ask you a question? Is there is there a single thing outside of 1252 C and 1357 that a state can do that's not preempted either by conflict or field preemption in your view? You pointed to two provisions in statute where Congress says you're allowed to cooperate. You state are allowed to cooperate. You said 1252 C and you said 1357. Is there anything outside of those two that a state can do that's not preempted in some way? Yes or no? I don't understand the question when you say that a state can do. You pointed to two things. You say there are two things that the states are allowed to do. Right. They're both given by by pure congressional grace. Right. You said 1252 C. You said 1357. So my question is, is there anything else? Is there anything a state can just do because it thinks is a good matter for the people of the state of Texas outside of what Congress has allowed them to do explicitly in those two statutes you referenced? There are plenty of things that a state can do that would affect the problems that Texas is complaining about. They can have generally applicable state laws that would apply to noncitizens. A lot of their submission to this court relates to to criminal activity. Obviously, they can they can work on that. And so it's not feel this is what I'm saying. It's like it feels not preempted. Then this is what I'm so confused by. Right. It's like you point you say it's feel preempted. Look at these two statutes that allow the states to participate. Right. And then I say, OK, what about outside of those statutes? Well, sure. There's other stuff that they could do. So it's not it's not really feel preemption. Right. You're really your argument is conflict preemption. And it's really boils down to conflict preemption as to the enforcement priorities of the executive branch, to which I don't understand what you do with cases like Kansas versus Garcia post Arizona, where the Supreme Court has been very clear that you can't you can't just come in and say, well, we would treat it differently. We would do removal as opposed to criminal or we would exercise enforcement discretion or whatever. And that should preempt the way Kansas wants to approach its state law. There's a lot baked into that question. So I'd like to if I might try to answer both the field and the conflict. Sure. So question as to the field. As the field preemption, I think Texas has characterized our view as as saying that any enactment that relates to the to the general field of immigration is preempted. And the Supreme Court rejected that into Kansas long ago. And nobody is saying that here. Now, of course, you know that you can't take that argument too far because you can't. That doesn't mean there can never be field preemption in the immigration area, because then Arizona would have come out the other way. So the question is really what we're talking about field preemption. You have to focus in on if you're talking about prosecuting crimes for violations of the federal immigration laws, you know, relating to the entry and removal of noncitizens. And that is what was going on in Arizona in Section three. And that's what's happening here. And so your question when your question was, is there anything Texas can do? There are many things they can do if they're not, you know, wading into a preempted field. Now, I can say Section three, but Section three didn't have anything to do with entry and removal. It was alien registration. You had to carry the paper. Right. You had to carry your alien registration paper, which is something a federal law says. Federal law also says it's a misdemeanor to not carry it. Arizona says, OK, well, now it's a state misdemeanor. And the court goes, no, you can't do that, even though they're completely consistent. Right. Because when it comes to registration and the schemes for registration, that's Congress gets to decide who's here, the terms under which they're here, the terms in which they have to register. That's a congressional decision. But they haven't said anything about that with respect to any of the other stuff that Texas is trying to do as far as I can tell. I mean, they have said that who's admitted and the conditions under which they're admitted. And I will just return to what I said earlier, that where where you enter the United States is quite crucial to that. If I could turn to the conflict portion of your question in Kansas versus Garcia was about a generally applicable law that happens to be applied in the circumstances of that case to a non-citizen. And the court said that as a general matter, if you have parallel, you can have parallel and state and federal enforcement when there is a state interest separate from the federal interest, even if they both bear on the same activity. And, you know, they didn't say anything about Arizona. They didn't say, oh, and when Arizona said the opposite in the field of non-citizen registration, we hereby overrule that. And they didn't you know, it's just a very different issue. And and so there's there's really they weren't breaking new ground there. They were applying the general rule that if you intrude on a federal field, then it's field preempted. And if you and if you if Congress has made evident, as it has in this context, the that it wants federal officers rather than state officers to be the ones making determinations about what should happen to non-citizens who are accused of violating the federal immigration laws, then it would also be conflict preempted. And nothing in Kansas suggested anything to the contrary to that. And it would be, you know, if the Supreme Court wants to revisit things that it said in Arizona, you know, that would be up to the Supreme Court. But in this posture, of course, that's not an argument that's available to Texas and they've appropriately not made it. I see my time is running down. I'm happy to answer questions about other aspects of the case. Chief, I've got one quick question, if. I just want to real quick, I didn't want to take too much of your time in the opening about the cause of action question, but can we I want to make sure I understand this. And I have sort of a two part question about your cause of action. Number one, as to your reliance on Debs, what would be your best case allowing the United States to sue under an implied cause of action and raid Debs to vindicate something that has nothing to do with property interests? So that's the first half of the question. And then the second half is I understand your only fallback to that is ex parte young. And help me understand your best case for the United States suing under ex parte young. OK, I mean, as to the first question, obviously, the most salient example is Arizona. I know that the other side's contention is that it's just that nobody contested it, but I think it is true that that has been done. And the fact that there are a number of cases in which the United States has done this in this precise area and nobody's ever questioned it certainly helps us more than it helps them. But no court's ever said it's OK. Right. I just want to make sure there's not there's no precedent that we haven't seen that says, oh, no, the United States is absolutely allowed to have this sort of roving supremacy clause power to kind of go around and say preempted, preempted the way the state argues. I mean, I mean, I mean, I'm not exactly sure how the other side is. I mean, I mean, nobody's ever said any of this is not OK. I don't understand exactly how the other side is characterizing the property interest. I mean, Debs was not about the property interest in the mail. There might have been some property interest lurking in the weeds, but that's not really what the cases have ever relied on. I mean, there's a case called against Bell Atlantic Telephone, where the United States had issued a patent and was trying to and then was trying to invalidate the patent because they thought that the patent actually had been obtained improperly. That's not the federal government's property interest. And there was no Supreme Court said that the United States was empowered to do that. And I guess just more fundamentally, I mean, this is an equitable cause of action. And the other side's main case is Armstrong. And if you read Armstrong, it it says, like, not literally the opposite of what they're saying, but pretty close. I mean, it starts by saying that there's no cause of action under the supremacy clause directly, and that's common ground. And then it says, of course, everybody agrees that ordinarily an equitable action would be available to restrain unconstitutional conduct unless it's been displaced by Congress. And then it goes into analysis of whether the particular action at issue in Armstrong had been displaced by Congress and concluded that it had. Now, what's missing from the other side's presentation in this court is any indication that Congress has displaced the cause of action here. In fact, cause of action is actually not what I apologize for using it. It's sort of an a historical term when you're talking about equity. I mean, usually what you say is, is this the sort of thing that you can go to courts of equity for? And the general presumption in American law has been that parties generally in the United States in particular is empowered when there are violations of federal law. And in the case of the United States, that intrude on sovereign interests to go to the courts and seek an injunction. And Armstrong recognized that that's generally true, but that in some circumstances, Congress has explicitly or implicitly displaced that. And what's missing from, as I said, from the other side's presentation is any indication that Congress has displaced it. And then on your last question about Ex parte Young, I mean, the other side's argument is that Ex parte Young is just for private parties. And the Supreme Court considered that argument in the Virginia versus office versus Stewart case that we cited in our brief, because what happened there was they said, oh, this isn't a private party. This is a state entity. And the Supreme Court said, well, the availability of Ex parte Young doesn't depend on the identity of the plaintiff. And so the other side's submission, I guess, is unless that the plaintiff is in the United States, and then it's totally different. But the Supreme Court didn't say any of that. And in fact, the sovereign immunity concerns that might lead you to restrict Ex parte Young would be even less applicable to the United States. So there really is no, I mean, your question, and I'll close with this on this subject, unless there's something else you want to ask me. But your question was phrased in terms of, you know, is there any law that in the precise circumstances of this case, somebody has raised the argument that Texas has made and the court has rejected it? And I guess I would just sort of turn that around. There's no law suggesting that there's any limitation of the kind that Texas is talking about. And Armstrong really makes clear that that is the relevant question. I'm happy to take any other questions from the panel. Otherwise, we would ask that the stay motion be denied. Also, just in the interest, as this court earlier recognized, of orderly proceedings, we would ask if the court is inclined in whole or in part to issue a stay, we would ask that the court delay the effectiveness of that stay to allow for any possible Supreme Court proceedings. In particular, we would suggest that the court could give the solicitor general three business days to determine whether to go to the Supreme Court. And then if the solicitor general elects to do so, to hold off on the effectiveness of its stay until the Supreme Court rules on that application. Thank you. Thank you, counsel. Thank you, Your Honor. May it please the court. Cody Wofsy, ACLU for the Las Americas plaintiffs. I want to jump into the conversation on a couple of points. I'd like to start with the removal provisions. Texas has essentially tried to write those provisions out of its own statute. But the text of the law is quite clear. If a removal order is issued, which is mandatory after every conviction under SB4, and the person does not leave, they are subjected to 20 years, up to 20 years in prison. As a district court explained, there's no practical difference between throwing somebody out of the country and ordering them to leave on threat of decades in prison. Texas itself recently told Congress that this is an expulsion power. So I think that there is no basis on which to say, well, we're not sure what this means. The text of the law itself is clear, and the legislative sponsor was clear that the point of this law was to remove people from the country. On field preemption, I want to pick up where Mr. Tenney left off, and in particular to address Judge Oldham's questions about entry. We believe that the entry provisions are just as preempted as the removal provisions on a field preemption theory. Regulating entry is a core sovereign authority of the United States. That goes back to cases like Nishimura E.Q. And as Chief Judge Richmond noted, Arizona says policies pertaining to the entry of aliens are exclusively entrusted to Congress. This court said the same in 2022 in the DACA decision. And that clearly satisfies the field preemption question as to whether there's a dominant federal interest. The interest here is not only dominant, but it's exclusive. There's also a comprehensive federal scheme about entry, as we've laid out, and just as in the registration scheme, allowing states to decide whether or not to prosecute what are these federal violations would disrupt that very same scheme. I realize you want to jump into the merits, and I want to make sure you have a chance to talk about that, but I'm concerned about the standing and judicial ability stuff that the state of Texas has argued. Can you help me understand? It sounds like your best cases don't involve pre-enforcement challenges. I gather your injuries are wholly indirect, right? You're not regulated by this in any way. You don't have any members who are regulated by this anyway. It's just that you might divert resources as a consequence of the enforcement of SB4 against third parties. So what is the best case that you have that that gives you standing to bring a pre-enforcement challenge against the statute? Yes, Your Honor. I'm happy to address these questions. Our claim here, the organization's standing claim, is just a classic Havens injury diversion of resources. Whether that's pre-enforcement or not really makes no difference. Now, Texas's argument here is based on the Susan D. Anthony case. As the district court explained, that doesn't apply outside of people who are actually directly threatened with enforcement. And Texas itself has brought many claims, both pre-enforcement and otherwise, in which it's not the directly regulated parties. So I direct the court to the 2015 DACA decision. And in the Supreme Court in that case, Texas actually told the Supreme Court, standing's not limited to regulated parties, and cited Susan D. Anthony in the course of that discussion. So as far as we know, there's no support for this idea, which would wipe out Havens standing. It would wipe out all sorts of standing by states, organizations, companies, etc., who may not be directly regulated. Well, I'm not sure it wipes out Havens. I mean, Havens' realty is obviously a Supreme Court case, and it says what it says. But I'm not sure that you can just sort of slide past it by saying, well, it shouldn't matter whether it's pre-enforcement or post-enforcement. I mean, allowing sort of this organizational standing, this impacts our mission, and we're going to have to spend more money in this and the other, those are obviously predictive judgments that you can make in an as-applied kind of circumstance. And you can point – you can file declarations and say, look, because of the statute, we had to do this or that or the other thing. But all of the things that you're talking about, education, those are, number one, indirect. And number two, they're in a pre-enforcement posture that's way more tenuous than they were in Havens' realty. So if Havens' realty is sort of one of the sort of outer bounds of Article 3, you're asking us to go beyond that and say, well, it also applies pre-enforcement. And even if that's true, I'm not sure how it really combines with your Ex parte Young theory because it's – and so I realize your time's running out. I hope that you can answer this if there's other things, and I'm sure the chief will help you with time. But I don't understand how you get over the state's sovereign immunity because then you're using both – you need Havens' realty combined with Ex parte Young in order to bring a suit against the state of Texas, and I don't see a case to let you do that. Thank you, Your Honor. So I think there's three parts to that question. I'd like to answer all of them. So on the first part, Texas has offered a categorical legal bar to pre-enforcement standing by non-regulated parties. That's wrong for the reasons I just said. I think what Your Honor's raising is somewhat separate, sort of factual on this particular record question. The district court looked at the record. The facts here are undisputed. District court found that these plaintiffs would indeed be severely harmed by SB 4 going into effect. That's subject to clear error review here, and that makes sense because this is not sort of a marginal change. We're talking about SB 4 radically altering the state of immigration in the state of Texas. It's creating an entirely new system where people are going to be subject to a state-made, state-run system with no access to federal relief, federal discretion. And so clearly our clients are scrambling to try and adjust to this entirely new system, and it's also not really in doubt how broad the system is going to be. The record is clear. Defendant McGraw projected 80,000 arrests a year under SB 4. That's a huge new process that is going to upend our system. So we don't think that there's any real factual problem here, and none of the defendants have actually brought forward any facts or contested the facts that we put in the record. Obviously, this could all be addressed on the merits in district court if that is an issue. And then turning to ex parte Young, we don't really understand the basis of Texas's argument here. If the point is that we have no cause of action, well, Crown Castle, the decision from this court, is extremely clear on that. Texas has never addressed it. It picks up right where Armstrong left off and says, yes, parties do have an equitable cause of action, and that's available without regard to whether there's an implied cause of action. And then as to ex parte Young, Texas doesn't dispute that McGraw is a proper ex parte Young defendant. They say, we're not allowed to sue because we're not regulated. But again, there's no cases that say that, and in fact, the Virginia Office of Protection case that the federal government cited is exactly the opposite. That's not a regulated party, and yet they can invoke ex parte Young. So I don't think that there are any threshold issues, and I just want to sort of reemphasize that even if there were some questions on this, for purposes of this day, in our view, there's no real question. The federal government can sue. They are a party in these consolidated cases. You only need one plaintiff. And so there's no basis to grant a stay on questions as to threshold issues for others, and that's the Bauscher case. I realize I'm over time. I'd like to answer any other questions if the court has them. Okay.  Thank you, counsel. If I may, I'd like to reiterate a point that I think has come across today's argument, and that is for the other side to prevail here. In other words, for this injunction to stay in place pending appeal, they really have to run the table. They have to be able to show that there's actually a cause of action in standing. They have to be able to show that there is a preemption and not just preemption of certain things. Preemption of everything, every possible application. They also have to show that there's no application under which Texas's constitutional right to defend itself is implicated here. And it's kind of hard to see how that's possible here. There's certainly some applications of this law that are lawful. And an example that comes to mind I think would be helpful for the court is look at page 410 of the Arizona decision. This is discussing section 6 of the Arizona law. This is cooperation. Under SB 4, that fact pattern would fall within the scope of SB 4. That is one fact pattern that would be certainly not preempted for the plain text of the decision of Arizona. So we know the not all applications of this law. Which piece of Senate Bill 4 are you saying falls in that fact pattern? So I'm looking here. This is section 6. This is on 410. This is cooperating with the Attorney General in identifying, apprehending or detaining or removing aliens not lawfully present in the United States. And it says that if there's cooperation between the federal government and the states, there's not preemption. What piece of section – do you say all of Senate Bill fits within that? I would think so. I'm looking at the verbs. Well, they go on in that very section they talk about. Well, when there's cooperation, that means in conjunction and consultation with the federal government, they have to be trained. Senate Bill 4 doesn't have any consultation period. Yes, Your Honor, but I'm saying if they say that there's a situation where there is some cooperation. So in other words, imagine that the federal government – because we're imagining it's a facial challenge. Imagine that there is some fact pattern where the federal government says, will you please help us with this? There you go. Now under SB 4, Texas law allows Texas officials to do that. That's an application. What about the other pieces? What specific piece of Senate Bill – that has nothing to do with arresting people who are here unlawfully and taking them to a border and telling them if they don't leave, they're going to go to jail for 20 years. Well, respectfully, Your Honor, I mean it does include detention and removal on the list of verbs. But I think as I also hear most of the concern of the panel – again, I don't want to put words in your own mouth – is about the removal provision of taking somebody to the border and taking them to the port of entry and making them leave. Now, like I said, I'm happy to defend that, but the answer, if you think that that is preempted by Arizona, would be severability. You would say they can enforce – Texas can enforce the laws as to arrest, but they can't enforce the laws as to removal. Arrest and detention. In other words, arrest and detention. You're talking about conceivably putting someone in prison for 20 years. And I'm saying that, respectfully, Your Honor, if that is the concern, that would also be preempted under – severed under Section 8 of SB 4. The court should look at the Section 8, the severability provision. Let's say we have a problem hypothetically that you cannot just arrest people and then take them to the border and say either you leave or we're going to re-arrest you and send you to prison. We say that's a problem. What pieces of Senate Bill 4 survive? Well, I think you could certainly arrest somebody if you see them crossing the border outside of lawful port of entry and take them to the federal government. I think that's – I don't see how that could possibly be preempted. Where does Senate Bill 4 direct someone to arrest them and take them to the federal government? Well, it says – Section 4 says you have the power to arrest. I'm assuming for purposes of Your Honor's question that there's a requirement. Anything else would be preempted other than taking somebody to the United States. If that's what federal law requires, which I'm not conceding, but let's say that that is, well, there you go. That would be under the severability clause of Section 8. You would sever any other thing that Texas could do, and that would leave Texas with the power to arrest, which Section – SB 4 would provide, and then there you go. So you're arresting – that would be arresting them for violating federal law? No, you'd arrest them for violating SB 4. SB 4 says it's against the law under Texas state law, which is its own sovereignty, to cross outside of a lawful port of entry. Texas law mirrors federal law with that respect. So Texas law has authorized its officers to arrest somebody in that circumstance for violating Texas law. And I think Texas can do a lot more than that, but I'm saying for purposes of a pre-enforcement facial injunction, that enough is enough to say that you have to at least a minimum send it back to the district court to figure out severability. And that just didn't happen here. The severability analysis, the court – it's largely in a footnote at the very end of the opinion, and he said it just wouldn't be practicable to do that severability analysis. It seems to be what you're saying is more or less what Justice Scalia said in his dissent in Arizona, that sovereigns ought to be able to – states ought to be able to exclude people from their borders who aren't – who can't be there lawfully. And that's essentially what you're saying. It seems to me that's what Senate Bill 4 does and what you're talking about in this piece of it is you're saying that Texas should have the right to arrest someone simply from – I say simply. It's not simply, but from coming across the border other than through a port of entry, basically trespassing onto Texas. Yes, Your Honor, and we are saying that, and I think trespass is a great example because Texas does arrest people who come across the border and trespass on Texas property. And you don't need Senate Bill 4 to do that. You've got trespass laws. Correct, but if that is lawful, then I don't see why this extra provision would be unlawful. And you might say it's unnecessary, bell and suspenders or something like that, but there's no preemption principle that says if you have two laws, one of them has to be unconstitutional. My point is the United States has never contested that Texas can arrest somebody who is trespassing on Texas property. If Texas sees that same person cross the border not onto Texas property, so it's not a trespass situation, but regardless, it's not a lawful port of entry, SB 4 says, well, you can arrest them. And I think you can do more than that, because as I read Arizona, this isn't field preemption. It would be conflict preemption, and we would go through that. But even if I'm wrong about everything other than what I just said about arrest, there would be some applications of SB 4 that would be lawful, and the court, the district court would have to do the severability analysis. And for purposes of a stay pending appeal, if you agree with me, I realize you might not agree with me, but if you agree with me, that's enough. That's enough, because you know that preemption, that injunction as offered by the district court is not going to stand. And the court might decide as a matter of its own good governance that will send it back down to the district court to do a better job of severability or something like that. But as you read the face of the district court's decision, the severability analysis respectfully just cannot be correct. And if that's the case, that's legal error. Legal error, per se, is abusive. But that doesn't mean that this court would have to let the entirety of Senate Bill four go into effect. In other words. Yes, Your Honor. I agree. I agree with you. Judge Oldham suggested it's rare. Typically, the court would send it back to the district court to fix the injunction. In the first instance, the court has the power to fashion its own modification of the injunction. If the court thought that was the right thing to do, I push back on it just because I think it would take a lot of briefing on severability and discussion on severability to do it. And it's hard for its court to do that in this kind of abbreviated stay posture. But which is why I think the law should just go into effect. But yes, Your Honor. If you if you think that the removal provisions are problematic and that maybe even some applications of the arrest provisions are problematic, the court would have the power for purposes of the stay pending appeal to modify the injunction going forward. And at a minimum, I respect your honor. You should do that. Because as I read the district court's severability analysis, I just don't think it's defensible. And I don't hear a lot of defense from the other side. And I think we've got your argument lists or other questions. Your Honor, we appreciate your time. Thank you. We ask that the state be granted. Thank you. We'll conclude the arguments for today. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.